## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **SPECIAL LEARNING, INC.**<br>   **a Delaware Corporation**,<br>**500 N. Michigan Avenue, Suite 300**<br>**Chicago, Illinois  60601**<br><br>        Plaintiff,<br><br>   v.<br><br>**STEP BY STEP ACADEMY, INC.**<br>   **an Ohio Corporation**,<br>**445 E. Dublin-Granville Road**<br>**Worthington, Ohio 44085**<br><br>        Defendant. | **COMPLAINT AND JURY DEMAND**<br><br><br>Case No. _____<br><br><br><br>Judge _____ |

Plaintiff Special Learning, Inc. ("Special Learning") hereby complains against Defendant Step By Step Academy, Inc. ("SBSA"), and for its causes of action are as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Special Learning is a Delaware Corporation with its principal place of business located in Chicago, Illinois.

2.    Defendant SBSA is an Ohio corporation with its principal place of business located in Worthington, Ohio.

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because Special Learning and Step By Step are citizens of different states and the amount in controversy exceeds the sum of $75,000.

4.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS
### (Incorporated into Each Separate Count As if Fully Re-Written Therein)

5.     Special Learning specializes in using technology platforms to deliver educational products and services for people living with Autism and other special needs.

6.     SBSA's business includes a treatment center for children with Autism, along with the provision of services designed to support those with Autism and their family members.

**The Initial CARF Project Agreement**

7.     In or about December 2011, SBSA approached Special Learning about teaming up with SBSA on a project to automate some of SBSA's business function needs in order to comply with the Commission on Accreditation of Rehabilitation Facilities (CARF) audit recommendations from SBSA's previous CARF audit.  The original scope of this project was to include the development of a web-based software application to allow SBSA to automate its manual business processes and workflows in respect to four major functions: (a) Billing, (b) Human Resources, (c) Patient Record-Keeping, and (d) Management Reporting.  Discussions regarding how to comply with the Electronic Health Records (EHR) requirements commenced during these discussions, but it was decided that the EHR element would be considered "out of scope" and subject to future discussions

8.     The original project proposal (the "CARF Proposal" or "Proposal") was sent to SBSA on January 18, 2012. This proposal included a "fixed fee" arrangement of $540,000 for the development portion of the project outlined in the CARF Proposal.   A true and correct copy of the original scope of the initial CARF Proposal is attached as Exhibit 1.

9.     Also, at that same time, SBSA and Special Learning moved forward with the scope of work initially set forth in the Proposal (the "Initial CARF Project").  In connection with

the ongoing work on the Initial CARF Project, Special Learning and SBSA agreed that fees would be billed monthly on a "time and material" basis, based upon actual hours worked and costs incurred. The first invoice was sent in February, 2012 for work performed in January, 2012. This practice of billing on a "time and material" basis based upon actual time and costs spent started in January 2012, and continued throughout the duration of the Initial CARF Project, as well as on and after and throughout the dates the parties executed and Special Learning performed under a written Software Development Agreement (described below), which continued to expand the scope of the project(s).

**The EHR Project**

10.     In or around May 2012, Special Learning and SBSA agreed that Special Learning would officially begin the work of investigating additional compliance requirements to allow SBSA to substantially meet one or more of the certification requirements for Electronic Health Records (EHR) systems as required by the Certification Commission for Healthcare Information Technology (CCHIT) Certified 2011 Behavioral Health EHR Certification Criterion (the "EHR Project"). Since the type of activity and scope of work for the EHR Project was substantially different from the ongoing Initial CARF Project, it was agreed that Special Learning would track and bill for the EHR Project activities separately from the Initial CARF Project billings. Work on the EHR Project commenced in May 2012 under the same "time and material" billing arrangement as used for the Initial CARF Project. A true and correct copy of the original scope of the initial EHR Project is attached as Exhibit 2.

**The Software Development Agreement ("SDA")**

11.     Ultimately, in December 2012, nearly one year after the Initial CARF Project had commenced, Special Learning and SBSA reached a written agreement that incorporated and

involved prior significant scope changes previously agreed to by the parties, as well as future predicted scope changes, from the original CARF Proposal and Initial CARF Project. The revised agreement was sent to SBSA on December 12, 2012, and included and incorporated the EHR Project requirements. The revised agreement, referred to as the Software Development Agreement ("Software Development Agreement" or "SDA"), was executed by SBSA on or after December 12, 2012.

12.     On or around December 12, 2012, Special Learning sent the SDA to SBSA for execution. A true and correct copy of the SDA is attached as Exhibit 3.  The key elements that were changed from the  Initial CARF Project agreement were: (a) the addition of the EHR compliance requirements to the project (some of which were incorporated from the EHR Project activities); (b) removal of the Billing requirement from the scope of work originally anticipated as part of the Initial CARF Project; (c) a change in the estimated  completion price to simply billing on a time and material basis until all work, including all changes continually requested by SBSA or required by the parties was completed; (d) automation to aide SBSA to operate in compliance with both the Commission on Accreditation of Rehabilitation Facilities (CARF) and Electronic Health Records (EHR) certification requirements and regulations; and, (e) the inclusion of the development of a web-based software application to allow SBSA to automate its manual business processes and workflows in respect to four major functions: (i) Case Management, (ii) Patient Record-Keeping, (iii) Management Reporting, and (iv) Human Resources.

13.     SBSA knew at the time that the SDA was entered into that the total estimated cost projected for the SDA was an estimate only.  Further, SBSA knew that as the design of the software proceeded, SBSA's timely input, testing, and feedback would be required on an

ongoing basis, as the different versions of the "as initially designed" beta and prototype versions of the software were completed. Additionally, SBSA knew that it could request changes, modifications, and other re-designs to the original specifications as the SDA project went forward. Finally, Special Learning and SBSA also agreed that changes in specifications or other elements of the development plan would be considered outside the scope of the SDA as originally drafted

14.     Throughout the duration of the Initial CARF Project from inception in December 2011, to May 2012, when SBSA decided to officially add the EHR compliance requirement to the work being performed by Special Learning, the project was in a constant state of flux while awaiting SBSA's decision on the EHR requirement. It was virtually impossible for Special Learning to independently create a project plan with any degree of certainty or accuracy unless and until SBSA provided adequate direction and made definitive choices about the desired scope of the projects. As such, Special Learning and SBSA agreed that a functional requirements document for the Initial CARF Project (developed from gathering requirements provided by SBSA staff on the HR module and Intake module, which originally began in January 2012) would be used as an initial guidepost for all work performed/to be performed by Special Learning under any of the projects/Agreements with which the parties were involved.

15.     The parties further agreed that some of the functions to be incorporated into the software were to be created in separate "modules" in order to facilitate efficient and effective development and implementation.

16.     The design modules agreed to between the parties under the SDA included: (a) the Intake Module, which included the case management function, patient record keeping

function, and management reporting function; and (b) the HR Module, which was to contain human resources functions.

17.    The completion of the Intake Module and the HR Module was intended by the parties to better enable SBSA to substantially meet one or more of the certification requirements for Electronic Health Records systems as required by CCHIT's Certified 2011 Behavioral Health EHR Certification Criteria. Although the parties also discussed the possible expansion of the SDA project to later involve additional work incorporating CCHIT's Meaningful Use ("Meaningful Use") requirements into the SDA project, this requirement was not included in the original scope, as the Meaningful Use Requirement was an optional set of requirements not required to comply with the EHR certification requirements.

18.    Pursuant to the parties' agreements, SBSA agreed that it was solely and exclusively responsible for providing Special Learning with detailed specifications for its required business processes in order to develop and finalize the functional requirements document which would be incorporated into the work being performed by Special Learning for SBSA. It was understood by both parties that the functional requirements document would be used by Special Learning's developers and engineers as a guidepost for the actual product design specifications before they began the actual software programming work, as any substantial modifications in the requirements requested or required during the programming phase would result in substantial delays and costs.

19.    SBSA further agreed that it would timely and continually provide: (a) constant and consistent testing of all versions of the software modules with timely communication and correspondence back to Special Learning to enable Special Learning to make reasonable modifications to the software to better meet SBSA's needs; (b) any minor business process

change requests, which required only minor modifications, to be incorporated into the SDA project; and (c) timely communication on any and all other aspects of the project. It was understood by both parties that SBSA's failure to meet this requirement would result in project timeline delays and additional costs to complete the projects.

20.     After initial meetings, Special Learning prepared an initial budget and timeline for the design of the software requested by SBSA based upon the information provided by SBSA. The initial budget and timeline contained an estimated cost for completion of the project based upon: (a) the initial scope of work, designed by Special Learning from the initial set of functional requirements developed for the original CARF Project which were set forth and approved by SBSA; and (b) initial discussions with SBSA regarding EHR requirements for which no written requirements document existed.

21.     Both parties knew at the time the initial scope of the project was defined and the initial project target budget and timeline were approved by SBSA that the estimated project cost was simply that—an estimate of the total time, rate, resource types, and any other work necessary to complete the initial development plan approved by SBSA based upon the facts and information available at that time.  The fee arrangement agreed by both parties was a "time and material basis" (as opposed to a lump sum, "fixed-fee" project cost) to account for the many "unknown variables" which both parties understood would materially impact the cost of the project.  In fact, no concrete lump sum price was established by the parties in connection with the initial development phase of the SDA, or at any time thereafter

22.     Pursuant to the SDA, SBSA agreed to pay to Special Learning a monthly development fee throughout the duration of the project, based upon a time and materials basis. The parties also agreed that Special Learning would submit monthly invoices using actual hours

worked, as opposed to the estimated budgeted figures. This billing arrangement continued throughout the duration of the relationship. Significantly, throughout the life of the SDA project, and up until the time of this dispute, SBSA paid, without exception, the full invoice amount related to the projects for which Special Learning was providing services.

23.     Additionally, the SDA required SBSA to reimburse Special Learning for any out of pocket expenses incurred in connection with the SDA, including, but not limited to, travel, outside expert consultants, infrastructure, and hosting requirements.

24.     Both parties anticipated the potential need for minor modifications to the initial functional requirements document based upon SBSA's testing and feedback, as well as any minor design modifications requested by SBSA as the project continued towards completion. However, it was also understood and agreed by SBSA that to the extent that any modifications were necessary or desired, such modifications would be subject to more man hours, yielding increased rates, charges, and costs depending upon the changes, modifications, or amendments to the development plan initially devised for the SDA.

25.     SBSA further agreed that in the event there were any SBSA requests, modifications, or other needs which delayed completion under the initial development plan, Special Learning would have the right to extend the due date for any deliverable by giving notice to SBSA.

26.     The SDA further provided that ownership of all deliverables would belong solely and exclusively to Special Learning pending receipt of full and final payment from SBSA.

27.     Finally, SBSA also agreed that a default by SBSA under the SDA would exist if: (a) SBSA failed, refused, neglected, or otherwise delayed in providing Special Learning with everything that it needed in order to ensure the successful and timely completion of the project

(including but not limited to timely and necessary feedback, documents, re-designs, modifications, testing, testing feedback, sign-offs, or any other dependency that caused Special Learning to be unable to timely complete the project); and/or (b) SBSA failed, refused or neglected to pay any invoice for more than 90 days from the invoice due date.

**The Initial Development Phase of The SDA**

28.      In or around April or May of 2012, when SBSA finally determined that it would require Special Learning to incorporate the EHR compliance requirements into the SDA and the overall project scope became more predictable, Special Learning began the process of developing a revised project plan based upon the information that had been provided by SBSA at the time.  The first version of the revised project plan was completed by June, 2012. A true and correct copy of the initially revised EHR project plan (also referred to as ABACUS Project Plan) is attached as Exhibit 4.  The project plan would assist the parties in agreeing on the initial scope of the project, anticipated timeline, and key assumptions.  Significantly, the SDA contained no cap or ceiling on the budget for completion of the work.

29.      The project plan set forth the initial projected scope, assumptions, and methodology to be utilized in developing the project, as well as a proposed timeline if the project was delivered as originally designed, and further assuming that both parties timely complied with their obligations under the SDA.

30.      The project plan specifically set forth the obligation of SBSA to sufficiently and timely communicate with Special Learning and the project team throughout the development timeline.

31.      The timeline for the project ran from May 2012 through May 2013.  The project plan further indicated that the projected timeline was based solely on projections and SBSA's

commitment to sufficiently and timely communicate with Special Learning's project team, but that the timeline was subject to variation depending upon the facts and circumstances that may arise as the project moved forward.

**SDA Project Disruption and the Content Management System Project**

32.     In or around June 2012 as Special Learning was continuing to fulfill its obligations under the Initial CARF Project, SBSA requested that Special Learning also create web-based software to house SBSA's research information and related proprietary assets (videos, images and articles).  This project was referred to as the Content Management System ("CMS") or Database (the "CMS Project"). The CMS Project was outside the scope of the ongoing Initial CARF Project as well as the anticipated SDA Project. Nonetheless, the CMS Project was a priority project according to SBSA, and Special Learning agreed to work on the CMS Project in conjunction with the other ongoing project. A true and correct copy of the CMS Project Agreement is attached as Exhibit 5.  The scope of the CMS Project was highly disruptive to the initial timeline established for the Initial CARF Project and the anticipated SDA project.  It was understood by both parties that adding the CMS project would cause significant delays in all ongoing projects.

33.     The development portion of the CMS Project started in or about July 2012, and continued through December 2012.  As with other SBSA projects, even though the CMS Project was substantially complete by January 2013, Special Learning ran into significant delays due to SBSA's non responsiveness.

34.     Although all the technical information required by SBSA to access the program (including training) was provided and Special Learning staff made themselves vigilantly

available for ongoing discussions along with a willingness to incorporate minor functional requirements changes desired by SBSA users, SBSA has not yet started to use the system.

**The HR Module**

35.     In January 2012, Special Learning started gathering user requirements to automate SBSA's existing manual processes for both the HR Module and Intake Module based upon the scope of services as originally outlined in the Initial CARF Project. Formal requirements gathering for the relatively less extensive HR Module started around February/March, 2012.

36.     Special Learning and SBSA jointly agreed that the development of the HR Module should be scheduled for completion and release first, followed by the Intake/Admissions module.

37.     Consistent with the parties' agreement, on or about April 1, 2012, Special Learning sent SBSA the Functional/User Requirements Document to receive user feedback regarding the features and functions anticipated for the HR Module. SBSA was to provide feedback and request any changes, additions, or omissions.

38.     On or about April 17, 2012, SBSA acknowledged receipt of the Functional/User Requirements and did not provide any other substantial feedback requesting any modifications or changes.  As such, Special Learning's development team began programming the HR module on or around April 27, 2012, based upon the originally designed Functional/User Requirements.

39.     On or about April 26, 2012, Special Learning received SBSA's official sign-off on the Functional/User Requirements as provided to them on or about April 17, 2012.

40.     On or about June 11, 2012, Special Learning informed SBSA that the beta version of the HR Module was completed and ready for testing by SBSA. Special Learning also set up a

meeting to train SBSA on the use of the HR module in order to satisfy the testing and feedback requirements to which the parties agreed.

41.     Two days later, on or about June 13, 2012, a call was arranged with SBSA for initial user testing and feedback.  During this call, both parties agreed that it would be beneficial to obtain feedback from SBSA staff unrelated to this project to test the applicant portion of the HR module.  SBSA arranged for staff members to test the applicant portion of the HR module.

42.     The next day, on or about June 14, 2012, Special Learning conducted a test of the HR module and ran a full test report on its functionality.

43.     On or about June 18, 2012, after obtaining successful test results and positive comments from other SBSA staff members who tested the HR Module, the HR Module and its functionality were approved by SBSA.

44.     Notwithstanding SBSA's approval of the HR Module, in an effort to provide continued service to SBSA and further enhance the usability of the HR Module and make it more robust and user friendly in order to deliver the best possible product, on June 18, 2012, Special Learning sought SBSA's approval to schedule another round of requirements gathering. SBSA agreed with Special Learning's request, and Special Learning continued its efforts in that regard.

45.     The requirements gathering uncovered many additional features and functions not included in the original functional requirements document. Although many of the features required substantial modification to the HR Module, both parties agreed that these enhancements, which included incorporating industry best practices and automating SBSA's existing hiring process, should be included in the HR Module.

46.     Special Learning and SBSA also agreed that several of the additional agreed-upon changes were outside the scope of the initial development and project plans (and would therefore

necessitate additional cost and expense) but recognized that they were necessary to make the HR system better. Special Learning informed SBSA that such an undertaking would take considerable additional work and would require Special Learning to redo some already completed portions of the HR module. SBSA approved the additions.

47.     The parties also agreed that once the additional changes were approved, a re-testing and Q&A process would be completed, and thereafter the program would be turned over to SBSA so that SBSA could begin using it.

48.     On or about July 6, 2012, SBSA provided Special Learning with its written hiring process to incorporate into the HR Module.  The impact of this modification would necessitate Special Learning modifying the HR Module to incorporate SBSA's existing workflow to enable a more user friendly experience.

49.     Special Learning also informed SBSA that it had hired an outside consultant in June 2012 to build a demo of the revised HR Module to incorporate the agreed upon changes, including improvements to the navigation of the HR hiring system. SBSA did not object to the hiring at the time.

50.     On or about July 25, 2012, after a thorough and exhaustive internal review of the demo of the revised HR Module, Special Learning requested that SBSA further review and approve the HR Module demo so that Special Learning could authorize its development team to move forward with incorporating the changes to the original HR Module.  SBSA reviewed the same, expressed its satisfaction of the revised HR Module to Special Learning, and listed a few additional items (beyond the initial project and development plans) to be added to the HR Module.

51.     On or about July 26, 2012, SBSA also forwarded additional forms to Special Learning to be included into the HR module.

52.     Thereafter, on or about July 27, 2012, SBSA requested yet more additions (outside of the initial project and initial development plan) to the HR module.  Again, Special Learning went to work to accomplish same.

53.     By July 31, 2012, Special Learning was approximately 60% complete with making the requested changes in programming the HR module. Special Learning informed SBSA that it anticipated an additional ten days of work to complete the balance of the HR Module with the then-current specifications requested by SBSA.

54.     Although the HR module was near completion, on or about August 9, 2012, SBSA expressed, for the first time, additional concerns with the server security aspects of the module.  Special Learning attempted to set up a meeting to discuss the same, but SBSA could not make itself available, as requested by Special Learning.

55.     On or about August 30, 2012, Special Learning began full quality assurance testing of the HR module, as revised and amended, and commenced work on creating a detailed user guide for the HR Module.

56.     On or about September 28, 2012, SBSA was notified that the HR module, as amended and revised and re-tested, was ready for user testing.  Special Learning also provided a user guide and inquired whether SBSA desired an additional walkthrough of the module.  SBSA failed, refused, or neglected to respond to the inquiry for the next ten days.  On or about October 8, 2012, however, SBSA informed Special Learning that it was experiencing sign-in issues for testing. After SBSA expressed its reluctance to create a Google account as was required to access

the module, Special Learning agreed to find another method for SBSA to test the HR Module, as amended and revised.

57.     On or about October 16, 2012, training on the HR Module was conducted with SBSA, and a revised user guide was completed and delivered to SBSA.

58.      During the same training call, SBSA requested an additional round of changes, (some of which were beyond the initial project scope).

59.     Thereafter, between November 2 and November 7, 2012, SBSA requested further changes and other additions to the module. Because of SBSA's continual and ever-changing requests for re-design and functionality alterations to the HR Module, it was impossible for Special Learning to finalize the turnover of the module to enable SBSA to use the as completed product.

60.     On or about November 2, 2012, SBSA raised yet another new concern--the protection and security of sensitive applicant data collected through the job posting portion of SBSA's new website. On or about November 6, 2012, SBSA's external Information Technology (IT) consultant contacted Special Learning to obtain the technical details regarding Special Learning's plans to address the data security issue. Upon reviewing the information provided by Special Learning, SBSA's IT consultant acknowledged that, despite SBSA's concerns, Special Learning was employing "best practices" and signed off on the data security plan created by Special Learning.

61.     On or about December 12, 2012, nearly two months after the revised HR Module and the user guide were delivered to SBSA, Special Learning finally received the final language that SBSA was required to incorporate into the HR module from SBSA's attorney.

62.     On or about January 22, 2013, Special Learning requested that SBSA conduct a final review of the HR module so that the process of handing over the HR Module could be initiated.  A meeting was scheduled for January 24, 2013.  Due to conflicting schedules of both parties, the meeting was never held or immediately re-scheduled.

63.     On or about February 6, 2013, Special Learning found a few infrastructure issues related to the HR module and immediately notified SBSA.  Special Learning opined that fixing the same was critical prior to turnover.  SBSA agreed to permit the additional time.

64.     On or about February 20, 2013, SBSA was notified that the February 6, 2013 issues were fully resolved and the additional features requested were completed and simply required SBSA's approval. More importantly, Special Learning requested SBSA's decision on several other outstanding matters, including SBSA's preference regarding the company that Special Learning should use to purchase the required Secure Sockets Layer (SSL) certificate demanded by SBSA which was necessary to address their security concerns.

65.     On or about February 21, 2013, Special Learning asked SBSA to select a date and time to finalize the turnover of the HR Module.  SBSA failed, refused, or neglected to provide a specific date for the next several weeks.  Twenty days later, on or about March 12, 2013, Special Learning once again followed up with SBSA, reminding it that an HR module turnover meeting was needed. Special Learning heard nothing from SBSA regarding this matter until April 26, 2013, over two months after the original request.

66.     Finally, after a delay of over three months, SBSA agreed to schedule a final call on May 22, 2013, concerning the HR module.

67.     During the May 22, 2013 call, the parties also discussed the status of other modules due under the parties' SDA and other related development projects not part of the SDA.

During the call, the receipt from SBSA of a Secure Sockets Layer (SSL) certificate was identified as a barrier to the website and HR Module going "live." The task of obtaining the SSL certificate had been assumed by SBSA's external IT consulting firm, which had not yet obtained the same. SBSA and Special Learning agreed to wait until the SSL certificate was obtained prior to pushing the HR Module live. In the interim, SBSA agreed that its HR team would start utilizing the development version of the HR Module immediately to get acquainted with the product and provide final feedback.

68. More than six months have passed, and to date, no other correspondence has been forthcoming from SBSA concerning the final approval of the HR Module.

**The Intake Module Portion of the SDA and the EHR Certification Requirements**

69. Special Learning started gathering user requirements for the Intake Module in January 2012 consistent with the CARF Proposal which did not originally include the EHR compliance requirement.

70. Early discussions regarding compliance with the EHR requirements began in January 2012, but were not finalized and incorporated into the SDA for nearly one year, although Special Learning's SDA proposal included same as early as May 2012.

71. The requirements-gathering activity for the intake module portion of the CARF Proposal commenced in January 2012.

72. On or about January 17, 2012, SBSA informed Special Learning that there was a possibility that the project scope would need to be expanded in the future to add the EHR compliance element to allow SBSA to comply with the Electronic Health Records (EHR) certification requirement and applicable federal law relating to same. In the interim, both parties

agreed that the EHR software requirement would not yet be included in the original CARF proposal.

73.     In order to allow Special Learning to conduct early investigation regarding EHR requirements and its potential impact to the original CARF project, as well as its implication to SBSA's business processes and its operations, Special Learning asked SBSA to provide additional information and delineation on the federal EHR requirements to enable Special Learning to determine if the intake module could be designed for EHR compliance.

74.     On or about January 18, 2012, Special Learning provided SBSA with its own preliminary, high level findings on EHR software certification requirements. Special Learning's findings indicated that although EHR-compliant software was able to be developed from a technical standpoint, it would require substantial and additional design and workflow elements that were not anticipated by the parties in the initial development or project plans for the Initial CARF Project or the SDA.

75.     On or about February 23, 2012, Special Learning received from SBSA a written document that outlined its desired functionality for the Intake Module, as well as its "wish list" of requirements.

76.     During the EHR requirements investigation process, the parties also discussed the need to review the optional Meaning Use Certification Requirement.  Special Learning and SBSA agreed that SBSA would investigate the Meaningful Use requirement criteria. Despite their promise, on February 17, 2012, SBSA admitted to Special Learning that SBSA had not completed their portion of the research, notwithstanding the fact that SBSA was now insisting that the EHR requirements be incorporated into a revised project plan for the intake module.

77.     Special Learning sent a follow-up inquiry and reminded SBSA of the substantial time, effort, necessary redesign and expense that would need to be added to the Intake Module (beyond the initial project scope) to meet SBSA's demand for EHR certification compliance.

78.     Again, SBSA admitted that, despite its previous promise, it had not looked into the issue any further than reviewing what Special Learning had provided SBSA on the issue. Notwithstanding SBSA's failure to conduct its own research, SBSA demanded that Special Learning "build something" and then test it after the fact for certification. Further, SBSA threatened that if the software built by Special Learning in this regard did not meet certification requirements, SBSA would not permit Special Learning to continue to build a useable and federally-compliant EHR software program.

79.     Special Learning reminded SBSA that it had the ability to build the EHR component, but the project would require SBSA's substantial involvement and input regarding SBSA's business process, systems, and methods to ensure federal compliance.

80.     On or about February 23, 2012, SBSA indicated for the first time that the overall SBSA admissions process would be included in SBSA's Intake Module. At this time, Samantha Fuller, the admissions specialist at SBSA, was the contact person at SBSA in regards to the Intake Module and represented the organization's interests concerning the ongoing projects.

81.     On or about February 29, 2012, SBSA forwarded several forms it requested Special Learning include in the Intake Module.

82.     On or about March 31, 2012, Special Learning contacted SBSA and obtained SBSA's agreement and commitment to participate in weekly meetings to ensure the Intake Module portion of the project moved along at a rapid pace and in a smooth manner.  SBSA agreed to same.

83.     As the Intake Module portion of the project continued to move forward, Special Learning remained in constant contact with SBSA. On or about May 2, 2012, SBSA created another detailed list of specific requests, clarifications, and additional forms it wanted incorporated into the software along with an enumeration of other features it demanded for inclusion.

84.     On or about May 10, 2012, Special Learning provided an overview of certain functional requirements identified by SBSA and requested confirmation that its overview was complete and accurate.

85.     On or about May 16, 2012, Special Learning prepared and delivered to SBSA the first full version (version V1.0) of the User Requirements document, which incorporated all the changes requested to date to the original requirements gathered by SL throughout the process, and the parties participated in a review session to go over the requirements document.  Special Learning further requested that SBSA conduct a detailed review and include feedback and suggestions to incorporate into the finalized product.

86.     After SBSA's review of the first draft of the Intake Requirements document, it became clear that several of SBSA's then-current workflow and business processes might need substantial revisions in order to incorporate the EHR element to meet the federal EHR compliance requirements. These additions would require the incorporation of a substantially large amount of new forms and revision of existing processes which would result in further increased costs, time, and effort to meet SBSA's demands.  SBSA was aware of these factors and approved the redesign accordingly.

87.     Based on the complexity of changes demanded by SBSA, and because SBSA had not yet provided Special Learning with its independent research on the federal EHR compliance

issue, Special Learning hired an outside consultant to conduct comprehensive research and analysis of the EHR regulations that SBSA had demanded but had failed to deliver to Special Learning as requested. As indicated in the original agreement, any outside consultants would be considered an out of pocket expense covered by SBSA.

88.     On or about May 19, 2012, based upon the complex, significant and substantial changes to both the Initial CARF Project and initial SDA demanded by SBSA, Special Learning began creating a project requirements document that would include the then-current redesigned projects' scope, including the breakdown of the individual modules necessary to meet SBSA's demands, including but not limited to, the EHR requirements. The document was utilized, in part, to discuss any components of the project(s) that were outside the scope of the original agreements.

89.     Additionally, based upon the research of its independent consultant, Special Learning was aware that another set of optional requirements called Meaningful Use Requirements, not addressed in the SDA, might need to be included into the redesigned module but at additional cost and expense.  Special Learning informed SBSA that much of the changes required in order to meet the Meaningful Use certification requirement was outside of the scope of the original agreement, but the parties recognized that implementation of the optional Meaningful Use Requirement would provide SBSA with the benefit of receiving cash financial incentives from the federal government.

90.     On or about May 21, 2012, SBSA responded to Special Learning's project requirements document and also included requests for yet further changes.

91.     On or about May 24, 2012, Special Learning responded. Thereafter, SBSA accepted the redesigned Intake Module and informed Special Learning that SBSA was pleased overall and excited about the additional requirements for the redesign.

92.     On or about May 25, 2012, Special Learning informed SBSA that Special Learning was in the process of hiring an EHR consultant who would audit the requirements documents in order to ensure that it included all the necessary elements, including required changes to SBSA's existing workflow and processes, to ensure compliance in a timely and efficient manner.  Further, Special Learning informed SBSA that due to the significant, substantial and complex changes in the projects' scope from its/their original plans, the time, cost and expense necessary to complete the project would be substantially increased.

93.     SBSA's executive director acknowledged the same, and a meeting was set up by Special Learning to discuss the revised plans and obtain SBSA's approval on a revised project scope including the attendant increased cost, expense, and timelines.

94.     Simultaneously therewith, Special Learning forwarded updated requirements to SBSA for their review and approval.  SBSA reviewed and approved the same.

95.     On or about May 29, 2012, Special Learning completed the EHR certification requirements document that was to be utilized for the redesigned development activities.

96.      Based upon new review comments from SBSA, on or about May 31, 2012, the redesigned requirements (version V11.0) were updated again.

97.     Thereafter, on or about June 1, 2012, a semi-final updated EHR Project Summary report for the redesign was provided to SBSA.  The updated project report included identification of the key objectives of the automation to enable SBSA to comply with the EHR requirements mandated by the Centers for Medicare and Medicaid Services (CMS) Organization and the

Office of National Coordinator for Health Information Technology (ONCHIT) and presented a proposed revised scope of the project including the EHR certification requirements.

98.     On or about June 5, 2012, Special Learning sent yet another updated Intake Requirements document to SBSA, incorporating additional feedback and adding details (version V12 of the intake requirement). Again, SBSA expressed its general overall satisfaction and excitement regarding the project.

99.     On or about June 6, 2012, SBSA contacted Special Learning and identified additional questions and concerns for which Special Learning provided feedback to SBSA.

100.    Thereafter, on or about June 13, 2012, SBSA provided yet further questions and concerns to Special Learning for review. Special Learning immediately responded to SBSA's request for further redesigns and updates to the intake requirements.

101.    On or about June 14, 2012, SBSA requested a timeframe for testing of the system once completed by Special Learning.  Special Learning explained that the development process would not begin until the Intake Requirements document had been finalized and Special Learning received appropriate signoffs from SBSA on the redesigned elements. SBSA was further informed that during the testing period, SBSA would have to make users readily available for an extensive testing.  SBSA knew that its availability and timely communication and feedback during the testing process were essential to the timely and successful completion of the project.

102.    On or about June 18, 2012, Special Learning sent yet another updated version of the Intake requirements to SBSA in compliance with SBSA's demands (version V13).  The additions made in V13 were substantial and included the implementation of SBSA's business

workflow and process requirements to meet approved EHR specifications.  Special Learning asked SBSA to review the updated version and provide any modifications or update requests.

103.    On or about June 20, 2012, Special Learning also created an EHR Compliance Overview report that included the additional requirements of the EHR implementation, as well as the impact on the time and cost of such implementation.

104.    On or about June 21, 2012, SBSA sent version V13 to its staff clinical psychologist for his review of the requirements and his input.  As a result of that review, SBSA sent a demand to Special Learning for additional changes and notified Special Learning that the upcoming structural changes in the Psychology department would require yet additional modifications.

105.    On or about June 29, 2012, Special Learning was informed that the contact person and primary individual at SBSA responsible for design approval was suddenly no longer in that position with SBSA, and a new contact person and decision maker was now in place, with whom Special Learning was required to communicate and obtain necessary approval(s).

106.    As of about July 26, 2012, Special Learning was scheduled to have the first release of the intake module prototype completed by August 8.

107.    As of about August 1, 2012, Special Learning estimated that in order for SBSA to meet the EHR regulations an estimated 40% to 60% of SBSA's current workflow processes would need to be changed. Special Learning suggested that prior to changes being made an EHR expert should be hired to identify the necessary modifications in SBSA's existing business processes to ensure that the requirements provided by SBSA were accurate.

108.    In or around August 2012, the final EHR design planning document was reviewed and approved by the head of SBSA's intake department.  At or about the same time, Special

Learning learned that SBSA's internal business processes required substantial revisions in order to incorporate EHR requirements. Special Learning then provided SBSA an option to incorporate the purely elective "meaningful use" requirements into the module (not part of the original scope document).  SBSA elected to incorporate the "meaningful use" requirements into the module nonetheless.

109.    As of September 3, 2012, as a result of the demands and constant and ongoing changes requested by SBSA, Special Learning had created thirteen different updated versions of the intake module to comply with SBSA's ever-changing demands.

110.    In November 2012, Special Learning's EHR consultant provided the results of his analysis of the Functional Requirements document against the specific EHR compliance requirements for SBSA and identified significant changes that needed to be made to the requirements document to comply with CCHIT certification requirements.  These latest changes included an entirely separate set of requirements from those already being implemented into the module.  This resulted in the project being moved even further outside the scope of the parties' original agreement.

111.    On or about November 20, 2012, a third-party testing and certification company was sent the most recent version of the program to measure for compliance.

112.    As a result of the testing, on or about November 27, 2012, Special Learning completed another updated version of the intake requirements, version 14 or, V14.

113.    On or about December 13, 2012, Special Learning requested a meeting with SBSA to review the status of the ongoing projects and discuss any additional changes. Special Learning also requested from SBSA samples of previous CARF audit reports to ensure that the

most recent user requirements also met CARF audit requirements.  SBSA failed to provide a timely response to this request.

114.    On or about December 18, 2012, an updated project task plan was created by Special Learning to document what tasks it believed needed to be completed regarding the intake module.

115.    In response to Special Learning's December 13 request for a status meeting, on or about December 19, 2012, SBSA informed Special Learning that a new person for SBSA would be taking over chief responsibility for the ongoing projects.  Jen Gannon, the new person responsible for the department, offered strong opinions on significant changes she personally wanted implemented to the software (which at the time of such requests was already at the 13th or 14th iteration demanded by SBSA).  This sudden, unexpected change of responsible personnel at SBSA, who possessed substantially different design beliefs, resulted in a substantial slowdown of the ongoing projects to enable the new SBSA representative to get up to speed on the projects' histories.

116.    On or about December 21, 2012, the parties, via telephone conference call, set out a revised plan of action on how to proceed going forward concerning the completion of the intake module.

117.    Special Learning also discovered at this time that the original estimated budget for the project as initially designed had been exceeded in light of the substantial, complex and repeated design changes requested by SBSA for implementation.  In fact, notwithstanding that SBSA had, on several occasions, signed off on specific versions of the requirements, SBSA subsequently made repeated requests for material changes on previously approved designs,

which required Special Learning to go back and, at times, completely revamp the development of the system.

118.    On or about January 7, 2013, Special Learning created a PowerPoint presentation to capture the redesigned intake module and EHR certification process.  The parties also began in January 2013 to have weekly calls to discuss the intake module project.  In order to help SBSA visualize the functioning of the actual system, Special Learning hired another consultant to build a prototype using detailed wireframes for the intake module (because of the increasing complexity of the intake module and the constant changes, Special Learning and SBSA wanted to be able to actually see how the module would function) to avoid yet another round of programming changes.

119.    On or about January 15, 2013, after nearly a four-week delay from Special Learning's original request for CARF Audit reports, SBSA finally sent Special Learning an itemized document listing SBSA's IT needs for CARF audit compliance.

120.    On or about January 29, 2013, Special Learning and SBSA engaged in a call to review in detail V14 of the Intake Module requirements document. This meeting resulted in SBSA requesting an additional six (6) pages worth of changes, many of them requiring substantial modifications.

121.    From January 29, 2013, to June 6, 2013, SBSA and Special Learning began weekly meetings and in some instances bi-weekly meetings. SBSA continually demanded weekly changes to the requirements.

122.    On or about February 13, 2013, SBSA indicated that its upcoming CARF audit (presumably for certification) would take place sometime between July and August, 2013.

123.    Additional changes were made to the prototype/wireframe on or about February 18, 2013, at SBSA's demand to meet other federal certification requirements.  Special Learning also sent SBSA a list of other certification requirements which SBSA was required to meet for certification and audit purposes.

124.    On or about March 4, 2013, some fifteen months into the project, SBSA suddenly requested that Special Learning make a significant change to the prototype. This material change essentially changed over 80% of the original prototype functionality by combining three separate sections into one (thereby changing all of the back end connections, database, and user interface that already existed in the original version of the software program).  As virtually all the process flow was changed, the development team estimated that Special Learning would only be able to use a small portion of the code from the original software.

125.    On or about March 13, 2013, Special Learning informed SBSA that the yet again revised intake wireframe/prototype was nearly complete and requested finalization of reporting requirements that could be turned over to the Special Learning development team for completion.  Special Learning requested a meeting to finalize the reporting requirements but received no response.

126.    On or about March 14, 2013, Special Learning and SBSA had a meeting to review the wireframe/prototype of the intake module. During that meeting, SBSA requested additional changes to the module yet again.

127.    On or about March 18, 2013, in response to an inquiry from Special Learning, SBSA provided yet further additional changes and requirements which SBSA demanded be incorporated into the module.  Special Learning again created a revised version of the intake requirements and updated the prototype.  As of March 18, 2013, version V15 of the requirements

document for the Intake Module was prepared by Special Learning to meet SBSA's ever changing demands.

128.    On or about March 27, 2013, SBSA demanded yet further revisions to the intake module wireframe/prototype.

129.    Thereafter, yet again, on or about April 15, 2013, after meeting with SBSA, Special Learning was required to make additional changes demanded by SBSA.

130.    Substantially throughout the entire history of the parties' working relationship, SBSA's regular pattern of systematic and ongoing changes to the modules became the norm, impeding the process of completing the projects as originally designed and originally estimated.

131.    On or about April 16, 2013, in response to SBSA's request, Special Learning began working with its staff in preparation for building a mobile application of the intake module, which was to be completely outside the scope of the original SDA.

132.    On or about April 18, 2013, approximately 100% of the Inquiry portion, 75% of the Admissions portion, and 75% of the Enrollment portion of the intake module wireframe/ prototype were substantially complete.

133.    On or about April 22, 2013, Special Learning asked SBSA to address certain issues which required its timely input for resolution but received no response. At the same time, Special Learning also sent SBSA a current version of the SBSA intake prototype.

134.    On or about April 25, 2013, Special Learning provided SBSA with an updated Intake module prototype. At this point, Special Learning had substantially completed each of the Inquiry and Admissions portion, the enrollment portion, and the events and management portions of the module and notified SBSA that upon SBSA's approval, it would be ready for development.

135.    SBSA reviewed a portion of the module, provided feedback to Special Learning, and on May 7, 2013, requested yet additional developmental staged changes.

136.    As of May 16, 2013, another updated intake prototype was provided to SBSA by Special Learning.  As of that date, Special Learning had created over fifteen iterations of the module and was now on approximately Version V16.  Despite all of the changes requested by SBSA, most of which materially altered the original scope of the projects, Special Learning continued to perform and make alterations at the request of SBSA without complaint or hesitation in good faith that SBSA would adhere to their obligations under the parties' agreements.

137.    By May 30, 2013, the Inquiry, Admission, Enrollment, Events, and Management portions of the intake wireframe were entirely complete.

138.    Notwithstanding completion, thereafter, SBSA provided yet more changes, and Special Learning submitted yet several additional updated versions of the constantly changing and redesigned module.

139.    Throughout the SDA project, SBSA's Business Manager, who was responsible for the overall success of this project, refused to attend or participate in the weekly meetings. Rather, upon information and belief, he simply forwarded the inquiries to lower level staff. Special Learning's inquiries were not timely responded to.  For this and other reasons, including but not limited to the repeated and substantial changes demanded by SBSA, and the new SBSA Intake Department project administrator, multiple completely different set of project requirements had to be created for the intake module at that time notwithstanding that most of the intake module was already substantially complete based upon the previous designs.

140.     Sometime between May and June of 2013, issues stemming from a separate joint venture project between the parties strained the relationship between them under the SDA and Initial CARF Project.

141.     Suddenly, on or about June 6, 2013, SBSA's then Executive Director directed the SBSA staff to cease any and all communications with Special Learning.

142.     Thereafter, unbeknownst to Special Learning, SBSA fired its Executive Director and the Business Manager took over as interim Executive Director.

143.     Despite the strain in the relationship between Special Learning and SBSA at that time, Special Learning still stood ready, willing, and able to move forward with completing the SDA project in good faith for the sake of the company and the investment made thus far by SBSA.

144.     SBSA refused Special Learning's overtures.

145.     During this time, Special Learning made repeated contacts with SBSA to inquire about the status of several unpaid invoices relating to the SDA and other projects contracted between the parties.  SBSA failed, refused, and/or neglected to pay the outstanding invoices, without any cause in law or fact.

146.     Notwithstanding SBSA's failure, neglect, and/or refusal to pay further project invoices, SBSA had the audacity on June 24, 2013, to demand completion of various contracted projects within six days.

147.     On or about July 17, 2013, Special Learning was set to deliver the nearly completed prototype of the SBSA Intake Module.  SBSA's response was to complain about the invoices which were a direct and proximate result of SBSA's constant changes and other

variables set forth in the Common Allegations above, most of which were beyond Special Learning's control.

148.    SBSA's acting Executive Director stated, without any basis in fact, that SBSA had not heard from Special Learning in regards to the projects despite the fact that he was invited by Special Learning to discuss these projects on several occasions.  He further claimed that SBSA had not received most of the completed projects.

149.    On or about July 22, 2013, Special Learning emailed SBSA, denying the acting Executive Director's assertions and indicating that the HR module, Website, and CMS projects had been completed and previously turned over to SBSA or were and had been awaiting SBSA's input which was required to finalize same.

150.    Special Learning fully complied with its duties and responsibilities under the parties' SDA agreements, including but not limited to the Initial CARF Project, the SDA, the EHR Project, and the CMS Project which were agreed/ contracted to between the parties.

151.    Special Learning has demanded payment for the services rendered, and SBSA has failed, refused, and/or neglected to pay the same.

152.    As a direct and proximate result of SBSA's breaches of the foregoing agreements, Special Learning has been damaged in an amount not less than $251,705.12, exclusive of interest, costs, and attorneys' fees.

**The Marketing Services and Community Outreach Agreements**

153.    The parties also entered into Marketing Services and Community Outreach Agreements, under which SBSA agreed to pay to Special Learning fees related to various marketing and community outreach endeavors. A true and correct copy of the Marketing Services and Community Outreach Agreement is attached as Exhibit 6.

154.    The marketing and community outreach endeavors which were part of the Marketing Services and Community Outreach agreement included, but were not limited to: creating additional marketing and community outreach programs; revising and updating content and design of various SBSA marketing and program overview materials; developing commercials and other videos for the semi-annual Autism Puzzle program for which SBSA was a major sponsor; producing and exploiting certain videos and video webcasts for broadcast and other purposes; writing and distributing press releases; and creating and updating SBSA's social media accounts, including Facebook, Twitter and LinkedIn.

155.    Special Learning fully performed under the parties' Marketing Services and Community Outreach Agreement and other agreements related to development and creation of Autism Puzzle project print and digital advertisements and commercials, producing and exploiting certain videos and video webcasts (the "Deliverables"). SBSA accepted the deliverables and has and continues to use the Deliverables in connection with its business endeavors. A true and correct copy of the video production agreement is attached as Exhibit 7.

156.    Special Learning has made repeated demands for payment from SBSA but SBSA has failed, refused, or neglected to pay for same, without any basis in law or fact. SBSA's failure to pay for the Deliverables constitutes a breach of the parties' Marketing Services and Community Outreach Agreements.

157.    Special Learning has been damaged as a direct result of SBSA's breach of the Marketing Services and Community Outreach Agreements in an amount not less than $36,825.16, exclusive of interest, costs, and attorneys' fees.

## COUNT I
## BREACH OF WRITTEN AGREEMENTS/CONTRACTS

158.     Special Learning hereby incorporates the above paragraphs of the Complaint as though fully set forth herein.

159.     Special Learning and SBSA entered into various written agreements, including but not limited to the Initial CARF Project, the EHR Project, the CMS Project, the SDA, and the Marketing Services and Community Outreach agreements, all of which are more fully described in the General Allegations above.

160.     Special Learning has fully performed its obligations under the parties' agreements.

161.     SBSA has breached the agreements in the form and manner more fully set forth in the Common Allegations above.

162.     Throughout the course of the parties' relationship while the agreements were in effect, SBSA continually changed the scope of the various projects as originally requested from Special Learning.

163.     The parties knew and understood, at the time of the changes in the projects' scope, that such changes would necessarily require increased cost and expense, and associated delays with the various projects' completion dates.  With this prior knowledge, the parties mutually agreed to the changes requested and/or demanded by SBSA in consideration for the exchange of additional work from Special Learning for additional consideration over and above the parties' original agreements.

164.     SBSA evidenced its assent to the requested changes in the projects' scope through its written and spoken communications with Special Learning, and through its acts, conduct, and course of conduct, all of which establish to a reasonable certainty that the change in the projects'

scope was assented to and intended by SBSA and collectively established SBSA's clear intent to compensate Special Learning for the additional work performed in reliance thereon.

165.     In the alternative, SBSA's conduct constituted a waiver of certain contractual provisions related to a change in project scope, and Special Learning relied upon SBSA's written and oral communications, actions, course of conduct and course of performance, to its detriment by relying upon SBSA's conduct and performing the additional requested changes.

166.     As such, it would be unjust or unfair to permit SBSA to avoid liability due to Special Learning's justifiable detrimental reliance on SBSA's written and oral communications, and course of conduct with respect to the increase in the various projects' scope.

167.     SBSA, under the circumstances, is estopped from denying liability to Special Learning, and manifest injustice would result to Special Learning if SBSA's obligation and agreement to pay Special Learning for such work can be avoided.

168.     As a direct and proximate result of SBSA's breaches and conduct, Special Learning has been damaged in an amount not less than $251,705.12 for work related to the Initial CARF Project, the EHR Project, CMS Project, and SDA, exclusive of interest, costs and attorneys' fees and $36,825.16 related to the Marketing Services and Community Outreach agreements, exclusive of interest, costs, and attorneys' fees.  In the aggregate, the damages suffered by Special Learning in connection with the parties' agreements total not less than $288,530.28, exclusive of interest, costs, and attorneys' fees.

## COUNT II
## BREACH OF ORAL AGREEMENTS/CONTRACTS

169.     Special Learning hereby incorporates the above paragraphs of the Complaint as though fully set forth herein.

170.    Special Learning and SBSA entered into various oral agreements, more fully described in the General Allegations above.

171.    Special Learning fully performed its obligations under the parties' oral agreements.

172.    SBSA breached the oral agreements in the form and manner more fully set forth in the Common Allegations above.

173.    Throughout the course of the parties' relationship while the oral agreements were in effect, SBSA continually changed the scope of the various projects as originally requested from Special Learning in writing and/or orally.

174.    The parties knew and understood, at the time of the changes in the projects' scope, that such changes would necessarily require increased cost and expense, and associated delays with the various projects' completion dates.  With this prior knowledge, the parties mutually agreed to the changes requested and/or demanded by SBSA in consideration for the exchange of additional work from Special Learning for additional consideration over and above the parties' original written or oral agreements.

175.    SBSA evidenced its assent to the requested changes in the projects' scope, through its written and spoken communications with Special Learning, and through its acts, conduct, and course of conduct, all of which establish to a reasonable certainty that the change in the projects' scope was assented to and intended by SBSA and collectively established SBSA's clear intent to compensate Special Learning for the additional work performed in reliance thereon.

176.    In the alternative, SBSA's conduct constituted a waiver of certain contractual provisions related to any oral changes in the projects' scope, and Special Learning relied upon

SBSA's written and oral communications, actions, course of conduct and course of performance, to its detriment by relying upon SBSA's conduct and performing the additional requested changes.

177.    As such, it would be unjust or unfair to permit SBSA to avoid liability due to Special Learning's justifiable detrimental reliance on SBSA's written and oral communications, and course of conduct with respect to the increase in the projects' scope.

178.    SBSA, under the circumstances, is estopped from denying liability to Special Learning, and manifest injustice would result to Special Learning if SBSA's obligation and oral agreements to pay Special Learning for such work can be avoided.

179.    As a direct and proximate result of SBSA's breaches, Special Learning has been damaged in an amount not less than $251,705.12 for work related to the Initial CARF Project, the EHR Project, CMS Project, and SDA, exclusive of interest, costs and attorneys' fees and not less than $36,825.16 related to the Marketing Services and Community Outreach agreements, exclusive of interest, costs, and attorneys' fees.  In the aggregate, the damages suffered by Special Learning in connection with the parties' agreements total not less than $288,530.28, exclusive of interest, costs, and attorneys' fees.

## COUNT III
## DETRIMENTAL RELIANCE

180.    Special Learning hereby incorporates the above paragraphs of the Complaint as though fully set forth herein.

181.    SBSA made certain written and oral representations to Special Learning and took other actions to induce action of a definite and substantial nature on Special Learning's part in the manner more fully set forth in the Common Allegations above.

182.    SBSA knew or should have known that its representations, both oral and written, and further evidenced by its actions, course of conduct, and course of performance, would induce action of a definite and substantial nature on Special Learning's part.

183.    SBSA intended that Special Learning rely on such written and oral representations, actions, course of conduct, and course of performance

184.    Special Learning justifiably relied upon SBSA's conduct, as more fully set forth in the General Allegations above, and took actions of a definite and substantial nature in reliance thereon by performing hundreds of thousands of dollars of work for SBSA.

185.    Special Learning justifiably relied upon SBSA's conduct, to its detriment by faithfully performing the services requested by SBSA, and by SBSA's refusal to pay for same.

186.    Manifest injustice would result if SBSA was not estopped from denying its obligation to pay Special Learning for the reasonable value of the services rendered to SBSA as a direct result of SBSA's actions, more fully described in the General Allegations above. Special Learning has fully performed its obligations under the parties' written agreements.

187.    As a direct and proximate result of SBSA's breaches, Special Learning has been damaged in an amount not less than $251,705.12 for work related to the Initial CARF Project, the EHR Project, CMS Project, and SDA, exclusive of interest, costs and attorneys' fees and not less than $36,825.16 related to the Marketing Services and Community Outreach agreements, exclusive of interest, costs, and attorneys' fees.   In the aggregate, the damages suffered by Special Learning in connection with the parties' agreements total not less than $288,530.28, exclusive of interest, costs, and attorneys' fees.

## COUNT IV
## PROMISSORY ESTOPPEL

188.    Special Learning hereby incorporates the above paragraphs of the Complaint as though fully set forth herein.

189.    Special Learning and SBSA entered into various agreements, more fully described in the General Allegations above.

190.    Special Learning fully performed its obligations under the parties' agreements.

191.    SBSA breached the written agreements in the form and manner more fully set forth in the General Allegations above.

192.    Throughout the course of the parties' relationship while the written agreements were in effect, SBSA continually changed the scope of the various projects as originally requested from Special Learning and promised to pay to Special Learning the value of the increased services rendered.

193.    SBSA's promises were relied upon by Special Learning, and Special Learning performed the additional services requested by SBSA.

194.    SBSA both intended that Special Learning rely upon the representations of SBSA, and made the representations knowing that Special Learning may rely upon same and change its position to its detriment by performing the additional services requested by SBSA.

195.    SBSA should be estopped from denying the existence of an agreement between the parties for the provision of the services more fully described in the General Allegations above.

196.    Injustice can only be avoided if the Court enforces the obligations referred to in this Count, and as more fully set forth in the General Allegations above.

197.    As a direct and proximate result of SBSA's breaches, Special Learning has been damaged in an amount not less than $251,705.12 for work related to the Initial CARF Project, the EHR Project, CMS Project, and SDA, exclusive of interest, costs and attorneys' fees and not less than $36,825.16 related to the Marketing Services and Community Outreach agreements, exclusive of interest, costs, and attorneys' fees.  In the aggregate, the damages suffered by Special Learning in connection with the parties' agreements total not less than $288,530.28 exclusive of interest, costs, and attorneys' fee.

**COUNT V**
**QUANTUM MERUIT**

198.    Special Learning hereby incorporates the above paragraphs of the Complaint as though fully set forth herein.

199.    SBSA repeatedly asked Special Learning to perform various services for the benefit of SBSA and its business upon SBSA's promise to pay for the reasonable value of the services performed by Special Learning for SBSA.

200.    SBSA intended that Special Learning rely upon the requests and promise for payment, and in reliance thereon, Special Learning fully performed the services requested by SBSA.

201.    SBSA has failed, refused, and/or neglected to pay for the reasonable value of the services provided to SBSA at SBSA's request.

202.    Under the facts and circumstances more fully described in the General Allegations above, Special Learning is entitled to payment for the services rendered to SBSA on a Quantum Meruit Basis.

203.    As a direct and proximate result of SBSA's breaches, Special Learning has been damaged in an amount not less than $251,705.12 for work related to the Initial CARF Project,

the EHR Project, CMS Project, and SDA, exclusive of interest, costs and attorneys' fees and not

less than $36,825.16 related to the Marketing Services and Community Outreach agreements,

exclusive of interest, costs, and attorneys' fees.  In the aggregate, the damages suffered by

Special Learning in connection with the parties' agreements total not less than $288,530.28,

exclusive of interest, costs, and attorneys' fees.

**COUNT VI**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

204.    Special Learning hereby incorporates the above paragraphs of the Complaint as

though fully set forth herein

205.    SBSA had a duty to perform its obligations in good faith under the parties'

various agreements and contracts (more fully described in the General Allegations above).

206.    This duty included, but was not limited to the obligation of SBSA to provide

input, testing, and feedback on a timely and ongoing basis; provide adequate direction and make

timely and definitive choices about the desired scope of the projects; provide Special Learning

with detailed specifications for SBSA's required business processes in order to develop and

finalize a functional requirements document which would be incorporated into the work being

performed by Special Learning for SBSA; and to otherwise provide timely and necessary

feedback, documents, re-designs, modifications, testing feedback, sign-offs, or any other

dependency that would affect completion of the projects.

207.    SBSA has breached the covenant of good faith and fair dealing by its conduct

more fully described in the General Allegations above.

208.    Special Learning is therefore entitled to recover from SBSA an amount to be

determined at trial to compensate Special Learning caused by SBSA's breach of covenant of

good faith and fair dealing, including but not limited to payment for the amount of work

performed by Special Learning which remains unpaid in an amount not less than $288,530.28, along with compensation for the lost opportunities Special Learning suffered as a direct and proximate result of the substantial delays occasioned by SBSA's conduct, all damages of which are exclusive of interest, costs and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Special Learning requests that this Court enter judgment in its favor and against Defendant SBSA in an amount not less than $288,530.28, together with interest (including pre-judgment interest), costs, and attorney's fees, or in such other amounts to which Special Learning proves entitlement, and award Special Learning such other and further equitable relief the Court determines necessary and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Special Learning hereby demands a jury trial of all issues in this action so triable.

DATED: January 31, 2014

/s/ Aaron T. Brogdon
Aaron T. Brogdon (0081858) (Trial Attorney)
SQUIRE SANDERS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700 (Phone)
(614) 365-2499 (Fax)

William G. Shanaberger (*pro hac vice application pending*)
29488 Woodward Ave. # 142
Royal Oak, Michigan 48073
(480) 773-2013

Counsel for Plaintiff Special Learning, Inc.